IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 1, 2024

## IN RE WHISPER B. ET AL.

**Appeal from the Juvenile Court for Wilson County**
**No. 22-JT-3     Charles B. Tatum, Judge**

_____

### No. M2023-01313-COA-R3-PT

_____

The legal father of two children and the putative father of one of the children both appeal a juvenile court's decision to terminate their parental rights. We affirm the juvenile court's decision to terminate their parental rights, but we reverse the juvenile court's decision to terminate the putative father's rights on the ground of failure to manifest willingness and ability.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed as Modified**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which CARMA DENNIS MCGEE and KRISTI M. DAVIS, JJ., joined.

Jacquelyn M. Scott, Lebanon, Tennessee, for the appellant, Justin B.

Daniel Joseph Turklay, Lebanon, Tennessee, for the appellant, Charles D.

Jonathan Skrmetti, Attorney General and Reporter, and Clifton Wade Barnett, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

#### FACTUAL AND PROCEDURAL BACKGROUND

Kimberly B. ("Mother") and Justin B. ("Father B.") had two children, Whisper and Justin Jr., during their marriage. Mother[1] had a short relationship with William D. ("Father D.") while she was married to Father B., and she later learned that Father D. was Whisper's biological father.

_____

[1] Mother's parental rights were terminated by the trial court, and she did not appeal that decision.

In February 2021, the Tennessee Department of Children's Services ("DCS" or "the Department") received a referral when Mother tested positive for THC after giving birth to Justin Jr. The Department attempted to contact Mother but never successfully reached her. In April 2021, DCS received a report of a domestic violence incident between Father B. and Mother. Father B. was arrested, and police found methamphetamine on him. As a condition of his bond, he was prohibited from contacting Mother; however, he violated this condition by contacting her.

The Department received another referral on May 5, 2021, stating that Father B. and Mother had been arrested. When DCS investigated, it found the children in a home without water or electricity. Whisper wore only a swim diaper, and Justin Jr. wore a onesie with urine up to his chest. Mother told DCS that, during the previous month, she had relapsed on methamphetamine. The children entered DCS custody on May 10, 2021, and, in June 2021, Whisper tested positive for methamphetamine and marijuana.

On June 3, 2021, Father B. tested positive for methamphetamine, and he was sentenced to serve eight years on various drug charges and another two years for child neglect. Due to his incarceration, Father B. could not visit the children. He was allowed biweekly phone calls with the children for ten minutes. However, because the children were so young, he mostly spoke to the foster parents during these phone calls.

Father D. knew of Whisper's existence and, following the child's birth in 2019, Mother repeatedly told him that he might be Whisper's father. However, Father D. never completed or requested a DNA test until after the Department contacted him. After the children entered DCS custody in May 2021, Mother told DCS that Father D. could be Whisper's father. Then, the Department contacted Father D. and requested that he complete a DNA test. He complied with the request, and the DNA test confirmed that he was the biological father.

The Department filed a petition to terminate Father B.'s and Father D.'s parental rights on May 26, 2022. After hearing the matter, the juvenile court entered an order terminating their parental rights. Regarding Father B., the court found that the following termination grounds had been proven by clear and convincing evidence: abandonment by wanton disregard, persistent conditions, severe child abuse, and failure to manifest an ability and willingness to assume custody. For Father D., the court found that the following termination grounds had been proven by clear and convincing evidence: failure to manifest an ability and willingness to assume custody, failure to establish paternity, token visitation, risk of substantial harm, and failure to pay reasonable and consistent support. The juvenile court also determined that termination of both Father B.'s and Father D.'s parental rights was in the best interest of the children.

Both fathers appealed and present the following issues for our review: whether the juvenile court erred in concluding that at least one termination ground was proven by clear

and convincing evidence and whether the juvenile court erred in concluding that termination of their parental rights was in the best interest of the children.

STANDARD OF REVIEW

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). However, this is not an absolute right, *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988), and in certain circumstances, the welfare of the child justifies interfering with parental rights. *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013). Tennessee Code Annotated section 36-1-113 sets forth the grounds for terminating a parent's parental rights. A petitioner must first establish that at least one of the grounds exists. Tenn. Code Ann. § 36-1-113(c)(1); *In re Angela E.*, 303 S.W.3d 240, 251 (Tenn Ct. App. 2010). Then, the petitioner must show that terminating the parent's parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re Angela E.*, 303 S.W.3d at 251.

Terminating parental rights legally reduces "the parent to the role of a complete stranger," *In re W.B., IV*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *6 (Tenn Ct. App. Apr. 29, 2005), and "sever[s] forever all legal rights and obligations of the parent or guardian." Tenn. Code Ann. § 36-1-113(l)(1). Therefore, "a parent has a constitutional right to fundamentally fair procedures during termination proceedings." *In re LaiLonnii J.*, No. E2018-01198-COA-R3-PT, 2019 WL 669758, at *3 (Tenn. Ct. App. Feb. 19, 2019). A petitioner must prove both the grounds for termination and that such termination is in the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citation omitted).

We review the trial court's findings of fact de no novo with a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *In re Serenity B*, No. M2013-02685-COA-R3-PT, 2014 WL 2168553, at *2 (Tenn. Ct. App. May 21, 2014). Furthermore,

> in light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights.

*In re Liam*, No. E2023-00370-COA-R3-PT, 2024 WL 495695, at *2 (Tenn. Ct. App. Feb. 8, 2024) (quoting *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016)).

ANALYSIS

I. Grounds for Termination

A. Father B.

i. Wanton disregard

A court may terminate a parent's parental rights if he or she abandons his or her child as defined in Tenn. Code Ann. § 36-1-102. Tenn. Code Ann. § 36-1-113(g)(1). Our legislature has provided several definitions of "abandonment," including:

> (iv) A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, . . . and has:
> . . .
> (c) With knowledge of the existence of the born or unborn child, engaged in conduct prior to, during, or after incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A). When DCS filed the termination petition on May 26, 2022, Father B. was incarcerated, and he had been incarcerated since May 5, 2021. Therefore, the first requirement was satisfied. *Id.* § 36-1-102(1)(A)(iv).

We must next consider Father B.'s pre-incarceration conduct because, under this ground,

> the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.

*In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005). "We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867-68.

- 4 -

Father B. used methamphetamine with Mother after the children were born, as evidenced by Whisper testing positive for methamphetamine shortly after entering DCS custody. Additionally, Father B. violated his bond by contacting Mother after a reported domestic violence incident. Considering these incidences in combination, we agree with the juvenile court's determination that Father B.'s pre-incarceration conduct exhibited a wanton disregard for the welfare of the children. Therefore, we affirm the juvenile court's determination that this termination ground was proven by clear and convincing evidence.

### ii. Persistence of conditions

The court also terminated Father B.'s parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3). This ground is often referred to as persistence of conditions and provides for termination of a parent's parental rights when:

> [A] child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a child is alleged to be a dependent and neglected child and:
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3).

We have previously stated that "the purpose behind this ground is to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn Ct. App. Mar. 3, 2008). "'A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care.'" *In re James W.*, No. E2020-01440-COA-R3-PT, 2021 WL 2800523, at *13 (Tenn. Ct. App. July 6, 2021) (quoting *In re Navada N.*, 498 S.W.3d 579, 605 (Tenn. Ct. App. 2016)). The question of whether the conditions necessitating removal persist depends on "'the results of the parent's efforts at improvement rather than the mere fact that he or she had made them.'" *In re Alivia F.*, No. M2016-02328-COA-R3-PT, 2018 WL 623599, at

*4 (Tenn. Ct. App. Jan. 30, 2018) (quoting *In re Audrey S.*, 182 S.W.3d at 874). So, courts consider "'the likelihood that the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care.'" *Id.* (quoting *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000)).

On May 10, 2021, DCS filed a petition alleging that the children were dependent and neglected, and that same day, the court entered an order removing the children from Father B.'s custody due to his incarceration, substance abuse, inadequate housing, and Whisper's positive test for illicit substances. There is no dispute that the May 2021 removal order was entered more than six months before the termination hearing began on June 16, 2023. The first two elements have, therefore, been satisfied. Tenn. Code Ann. § 36-1-113(g)(3)(A)-(B).

At trial, the conditions that led to the children's removal from Father B.'s custody persisted, and there is little likelihood that these conditions will be remedied so that the children could return to him safely in the near future. Father B. remained incarcerated at the time of trial, meaning he remained unable to provide the children with adequate housing. Additionally, Father B.'s continued substance abuse issues resulted in his current incarceration and, due to that incarceration, he has not demonstrated that he can refrain from substance abuse in an uncontrolled environment. *In re James W.*, 2021 WL 2800523, at *13 (concluding that persistent conditions existed because the mother had "not exhibited an ability to refrain from drug use for a prolonged period of time outside of a controlled environment").

Because Father B. had several years of incarceration remaining, it is unlikely that conditions preventing reunification would be remedied at an early date. *See* Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii). Furthermore, the continuation of the parent and child relationship would diminish the children's chances of early integration into a safe, stable, and permanent home. The children are doing well in their current foster home, where they have been since May 2021. They have bonded with the foster family, and the foster parents are interested in adopting the children if they become available for adoption. We conclude that DCS established this ground by clear and convincing evidence.

### iii. Severe abuse

Another ground for termination of parental rights is when the parent "has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child." Tenn. Code. Ann. § 36-1-113(g)(4) (2022).[2] Severe child abuse includes "[t]he knowing exposure of a child to

---

[2] Courts apply the version of the statute that was in effect when the termination petition was filed. *In re C.L.*, No. E2018-02032-COA-R3-PT, 2020 WL 359743, at *9 n.8 (Tenn. Ct. App. Jan. 21, 2020).

or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death[.]" Tenn. Code Ann. § 37-1-102(b)(27)(A)(i) (2022). "A lasting injury is not required to sustain a finding of severe child abuse." *In re Emmalyn H.*, No. E2022-00710-COA-R3-PT, 2023 WL 3411598, at *6 (Tenn. Ct. App. May 12, 2023).

Father B. used methamphetamine with Mother, and Whisper later tested positive for methamphetamine.[3] This Court has previously held that methamphetamine exposure is "likely to cause them serious bodily injury." *In re Sophia S.*, No. E2020-01031-COA-R3-PT, 2021 WL 3236347, at *6 (Tenn. Ct. App. July 30, 2021). And, a child's exposure to methamphetamine generally constitutes clear and convincing evidence of severe child abuse. *In re Caydan T.*, No. W2019-01436-COA-R3-PT, 2020 WL 1692300, at *5 (Tenn. Ct. App. Apr. 7, 2020). Father B. does not dispute using methamphetamine, nor does he dispute that the child was exposed to methamphetamine. His argument focuses on the "knowing" requirement for this ground. In particular, he argues that he did not knowingly expose the child to methamphetamine because he only used methamphetamine away from the children in the barn or the car, and he did not know that methamphetamine could be transferred through touch.

Our Supreme Court recently held, however, that:

> for severe child abuse, a person's conduct is considered "knowing," and a person is deemed to "knowingly" act or fail to act, when he actually knows of relevant facts, circumstances or information, or when he is either in deliberate ignorance of or in reckless disregard of such facts, circumstances, or information presented to him. Under this standard, the relevant facts, circumstances, or information would alert a reasonable parent to take affirmative action to protect the child. For deliberate ignorance, a parent can be found to have acted knowingly when he has specific reason to know the relevant facts, circumstances, or information but deliberately ignores them. For reckless disregard, if the parent has been presented with the relevant facts, circumstances, or information and recklessly disregards them, the parent's failure to protect can be considered knowing.

*In re Markus E.*, 671 S.W.3d 437, 444 (Tenn. 2023). Father B. knew that he and Mother were using methamphetamine while the children were in their care, and yet he knowingly took very few precautions to prevent the children's exposure from his own use or to protect the children from exposure from Mother's methamphetamine use. In other words, Father B.'s failure to act satisfied the knowing requirement. We affirm the juvenile court's determination that DCS proved this ground by clear and convincing evidence as to Whisper.

---

[3] The Department was unable to conduct a hair follicle drug test for Justin Jr. because he was very young and did not have enough hair.

In addition, we affirm the juvenile court's termination of Father B.'s rights to Justin pursuant to Tenn. Code Ann. § 36-1-113(g)(4) based upon Father B.'s severe abuse of Whisper. Tennessee Code Annotated section 36-1-113(g)(4) provides that a court may terminate a parent's rights if the court finds that the parent "committed severe child abuse *against any child*." (Emphasis added). Therefore, we conclude that Father B. committed severe child abuse upon Justin based on the finding that he committed severe child abuse upon Whisper.

### iv. Failure to Manifest an Ability and Willingness to Personally Assume Custody

The juvenile court also terminated Father B.'s parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(14). This ground requires a party to prove two elements by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1), (g)(14). First, a party must prove that the parent failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). Second, a party must prove that placing the children in the parent's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14).

To establish the first prong, the party seeking to terminate parental rights need only prove that a parent failed to manifest either an ability or a willingness to assume custody. *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13-14 (Tenn. Ct. App. June 20, 2018)). "Ability focuses on the parent's lifestyle and circumstances[,]" and willingness focuses on the parent's attempts "to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). Mere words alone are not enough to show willingness. *Id.*

Father B. does not have the ability to assume custody of the children. At the time of trial, he lacked stable housing and employment because he remained incarcerated under a ten-year prison sentence, and he did not know when he would be released. Also, Father B. failed to demonstrate that he could maintain sobriety outside of a controlled environment.

Regarding the second prong, the evidence in the record demonstrates that placing the children in the Father B.'s custody "would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). The circumstances that pose "a risk of substantial harm" are "not amenable to precise definition because of the variability of human conduct." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001); *see also In re Legion S.*, No. E2021-01198-COA-R3-PT, 2022 WL 17104411, at *5 (Tenn. Ct. App. Nov. 22, 2022). But, "[s]ubstantial harm" requires "a real hazard or danger that is not minor, trivial, or insignificant" and, "[w]hile the harm need not

be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not." *Ray*, 83 S.W.3d at 732.

Removing a child from their current placement and forcing a child to live with a near stranger could constitute substantial harm. *See State v. C.H.H.*, No. E2001-02107-COA-R3-CV, 2002 WL 1021668, at *9 (Tenn. Ct. App. May 21, 2002) (stating that due to the negative emotional consequences of removing the child from their foster parents and due the father's "callous disregard" for the child's relationship with their foster family, granting the father custody posed a risk of substantial harm); *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 17, 2020) ("[F]orcing the child to begin visitation with a near stranger would make psychological harm sufficiently probable."). Furthermore, "parents with a significant, recent history of substance abuse, mental illness, and/or domestic violence could lead to a conclusion of a risk of substantial harm." *In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021).

Given that Father B.'s current incarceration is his third lengthy prison sentence, that there was a domestic violence incident resulting in a protective order, and that Father B. violated the protective order, we agree with the juvenile court's finding that placing the children in Father B.'s custody would pose a substantial risk of harm to the physical and psychological welfare. We conclude that this termination ground was proven by clear and convincing evidence.

### B. Father D.

The juvenile court terminated Father D.'s parental rights to Whisper pursuant to the putative father grounds set forth in Tenn. Code Ann. § 36-1-113(g)(9)(A). A putative father includes a person who is the biological but not the legal father of a child who "has made a court filing or appearance consistent with the person's claim of paternity." Tenn. Code Ann. § 36-1-102(45)(B). DNA testing confirmed that Father D. qualified as a putative father. Putative fathers' rights can be terminated upon one or more of the following grounds:

> (i) The person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department pursuant to § 36-5-101;
> (ii) The person has failed to seek reasonable visitation with the child, and if visitation has been granted, has failed to visit altogether, or has engaged in only token visitation, as defined in § 36-1-102;
> (iii) The person has failed to manifest an ability and willingness to assume legal and physical custody of the child;

(iv) Placing custody of the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; or

(v) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(2)[.]

Tenn. Code Ann. § 36-1-113(g)(9)(A). "The putative father grounds set forth 'less exacting' requirements for termination than for other grounds," *In re Rilyn S.*, No. E2018-00027-COA-R3-PT, 2019 WL 1130442, at *5 (Tenn. Ct. App. Mar. 12, 2019) (quoting *In re Alexis M.M.*, No. E2012-00022-COA-R3-PT, 2012 WL 3553628, at *5 (Tenn. Ct. App. Aug. 20, 2012), and "do not include a willfulness requirement." *In re H.A.L.*, No. M2005-00045-COA-R3-PT, 2005 WL 954866, at *9 (Tenn. Ct. App. Apr. 25, 2005). The juvenile court determined that all five had been proven by clear and convincing evidence. We will consider each in turn.

### i. Failure to Make Reasonable and Consistent Payments

Father D. did not make consistent payments to support Whisper, and he failed to provide any reason for why he was not able to do so. Evidence entered at trial showed that Father D. had full-time employment earning enough to provide some support for Whisper. However, he never made a single support payment. Therefore, we affirm the juvenile court's conclusion that this ground was proven by clear and convincing evidence.

### ii. Token Visitation

"'Token visitation' means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory[4] visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." *Id.* § 36-1-102(1)(C). "Whether visitation is 'token' under this definition is a fact-intensive inquiry to be decided on a case-by-case basis." *In re Keri C.*, 384 S.W.3d 731, 748 (Tenn. Ct. App. 2010).

Father D.'s visitation with Whisper was not perfunctory. The court granted him four hours of visitation per month, and he visited Whisper six times, with the visits lasting between two and four hours each. After the sixth visit, the company organizing visitation told Father D. that there were scheduling issues with DCS and the foster parents. When further visits were not scheduled, he filed a motion to compel visitation in February 2023.

---

[4] *See In re Keri C.*, 384 S.W.3d 731, 750 n.9 (Tenn. Ct. App. 2010) (defining "perfunctory" as "'characterized by routine or superficiality: done merely as a duty' or 'lacking in interest or enthusiasm: apathetic, indifferent'") (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1678 (1993) (unabridged)).

The Department then offered to supervise visits but no visits were ever scheduled. When visits were scheduled, Father D. brought toys and snacks to the visit for Whisper and tried to engage with her, showing that these visits were important to him and that he wanted to attend.

However, the visits were of such "an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." *See* Tenn. Code Ann. § 36-1-102(1)(C). Father D. was a stranger to Whisper when the visits began, and after only six visits, Whisper did not form a bond with him. DCS testified that it was unclear whether Whisper even recognized him between visits. Whisper also showed a preference for being with and staying with her foster mother during the visits. Therefore, Father D.'s visits constituted token visitation because they were too few to establish substantial contact. We affirm the juvenile court's determination that this ground was proven by clear and convincing evidence.

### iii. Failure to Manifest an Ability and Willingness to Assume Legal and Physical Custody of the Child.

The juvenile court found that Father D. failed to manifest a willingness and ability to assume custody under Tennessee Code Annotated section 36-1-113(g)(14) and section 36-1-113(g)(9)(A)(iii). Section 36-1-113(g)(9)(A)(iii) requires the same type of proof as that was discussed above for establishing the first prong of (g)(14). *In re J.S.*, No. M2022-00142-COA-R3-PT, 2023 WL 139424, at *10 (Tenn. Ct. App. Jan. 10, 2023). Looking at Father D.'s lifestyle and circumstances, the juvenile court concluded that his failure to establish paternity for two years belied his professed willingness to assume custody of Whisper. Although we do not condone his failure to establish paternity sooner, we cannot ignore the efforts he made once learning he was Whisper's biological father. For instance, he showed that he had stable housing and employment. In his home, he designated and furnished a bedroom for Whisper, and he bought her clothes despite DCS failing to respond to his multiple requests about what size clothes she wears. Furthermore, he attended all six of the visits scheduled for him. When the company organizing visitation failed to schedule him visits for December 2022 or January and February 2023, he filed a motion to compel visitation. In light of these efforts, we cannot conclude that the termination grounds under Tenn. Code Ann. § 36-1-113(g)(14) and § 36-1-113(g)(9)(A)(iii) were proven by clear and convincing evidence. We, therefore, reverse the juvenile court's decision regarding the willingness and ability ground under both of these sections.

### iv. Risk of Substantial Harm to the Psychological Welfare

When considering whether a child would be at risk of substantial harm to their welfare, we consider the potential harm of removing them from the stability of their foster home. *See C.H.H.*, 2002 WL 1021668, at *9. Whisper has been with the same foster family since May 5, 2021. She calls her foster parents "mom" and "dad" and has developed a

relationship with her foster brother. Additionally, she has an extremely close bond with her half-brother, Justin Jr.

We also consider whether there is a relationship between the putative father and the child since having a near stranger assume custody would make psychological harm sufficiently probable. *See In re Braelyn S.*, 2020 WL 4200088, at *17. Father D. only visited Whisper six times, and it was unclear whether she remembered him between visits. Thus, at trial, Father D. remained a near stranger to her. Placing Whisper in Father D.'s custody would risk substantial harm to her. We conclude that this ground was proven by clear and convincing evidence.

### v. Failure to File a Petition to Establish Paternity

A court may terminate a putative father's parental rights when he does not file a petition to establish paternity within thirty days after notice of alleged paternity. Tenn. Code Ann. § 36-1-113(g)(9)(A)(v). Notice includes an "oral statement to an alleged biological father from a biological mother that the alleged biological father is believed to be the biological father or possible biological father." *Id.* § 36-1-113(g)(9)(B)(ii).

Around May 2020, eight months after Whisper was born, Mother told Father D. that he might be the biological father of Whisper. However, he never filed a petition to establish paternity. Indeed, he did nothing to establish paternity until DCS contacted him after the children entered its custody in May 2021 and requested that he submit to a DNA test. We affirm the juvenile court's determination that this termination ground was proven by clear and convincing evidence.

### II. Best interest

After determining that the petitioner has established one of the grounds for terminating parental rights, we must next decide whether terminating parental rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c). When deciding whether termination of a parent's parental rights is in the child's best interest, we "consider all relevant and child-centered factors applicable to the particular case before the court" including but not limited to the factors in Tenn. Code Ann. § 36-1-113(i)(1)(A)-(T). *Id.* § 36-1-113(i)(1). Ascertaining what is in a child's best interest "does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s [] factors," but rather, "the relevancy and weight to be given each factor depends on the unique facts of each case". *In re Brantley B.*, No. M2016-02547-COA-R3-PT, 2017 WL 4877456, at *6 (Tenn. Ct. App. Oct. 30, 2017) (quoting *In re Audrey S.*, 182 S.W.3d at 878). In fact, one factor may be determinative. *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005). Even in those instances, the court must consider all factors. *Id.*

- 12 -

Tennessee Code Annotated section 36-1-101(d) provides that "when the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child." Public policy disfavors long-term foster care, and it is rarely in the best interests of the child. *In re Adoption of J.A.K.*, No. M2005-02206-COA-R3-PT, 2006 WL 211807, at *4 (Tenn. Ct. App. Jan. 26, 2006). Thus, "many of the statutory best interest factors relate to the likelihood that the child will be able to leave foster care and return to the parent's home in the near future." *Id.*

The first factors consider stability, the emotional effect of living with the parent, and the positive relationships in the child's life. Here, these factors strongly favor terminating Father B.'s and Father D.'s parental rights. The children have been with their foster family since they were removed from Father B.'s custody on May 5, 2021, and they refer to the foster parents as "mom" and "dad." The foster parents would also adopt the children if given the opportunity. *See* Tenn Code Ann. § 36-1-113(i)(1)(H)-(I) ("Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent," and "[w]hether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage.").

Father D. has only visited Whisper six times and is a near stranger to her, while Father B. remained incarcerated at the time of trial and did not know when he would be released. *See* Tenn Code Ann. § 36-1-113(i)(1)(C) ("Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs."). Additionally, Whisper has not been able to form a secure and healthy attachment with Father D. as they have only had six visits together, and forming a secure and healthy attachment is unlikely because Whisper is already attached to her foster parents. As for Father B., Whisper and Justin have had only short phone calls with him since being removed from his custody, and he mostly spoke with the foster parents during those calls. Therefore, Father B. also does not have a secure and healthy attachment to the children. *See* Tenn Code Ann. § 36-1-113(i)(1)(D)-(E) ("Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment," and "[w]hether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child.").

A switch from Whisper's current foster care placement to either Father B.'s custody or Father D.'s custody would likely cause psychological harm to Whisper as neither parent has ever provided her with stability by meeting her housing and material needs. She has never lived with Father D., nor has he provided any support for Whisper. As for Father B., his actions caused Whisper to test positive for methamphetamine and led to his most recent incarceration. *See* Tenn Code Ann. § 36-1-113(i)(1)(A)-(B) ("The effect a termination of parental rights will have on the child's critical need for stability and continuity of

placement throughout the child's minority," and "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition.").

The next factors consider the effort put into a change in circumstances. The record contains no evidence showing that it would be unsafe for Whisper to be in Father D.'s home. *See id.* § 36-1-113(i)(1)(J) ("Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner."). Factor J is therefore inapplicable to him. Due to Father B.'s incarceration he has not demonstrated a change in circumstances; however, he has taken advantage of available classes within the prison to attempt to change his circumstances. *See id.* § 36-1-113(i)(1)(K) ("Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions.").

The Department created permanency plans for Father B. and Father D. The Department also helped organize visitation for Father D. and phone calls for Father B. *See id.* § 36-1-113(i)(1)(L) ("Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department"). However, because Father D. did not establish paternity of Whisper until more than a year after Mother told him that he might be the father, he had limited time to form a relationship with Whisper. *See id.* § 36-1-113(i)(1) (M) ("Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest"). In regard to Father B., his incarceration prevented him from creating a stable and safe home for Whisper and Justin that was free of illicit substances.

The last factors involve a parent's willingness and ability to care for a child. Factor N does not apply to Father D., but it weighs against Father B. because he severely abused the children by exposing Whisper to methamphetamine, using methamphetamine while the children were in his care, and allowing the children to remain in Mother's care despite knowing that she was using methamphetamine. *See id.* § 36-1-113(i)(1)(N) ("Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult.").

Father D. demonstrated that he understood how to provide for Whisper's needs by buying clothes and that he was committed to maintaining a home that met her basic needs by setting up a bedroom for her. He also has other children that he provides for. Father B.,

on the other hand, has not been able to provide a safe home or demonstrate an understanding of Whisper's and Justin's needs due to his incarceration. *See id.* § 36-1-113(i)(1)(O)-(R) ("Whether the parent has ever provided safe and stable care for the child or any other child," "[w]hether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive," "[w]hether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive," and "[w]hether the physical environment of the parent's home is healthy and safe for the child.").

In sum, the children have a strong relationship with their foster parents. Whisper does not have a relationship with Father D., and Father B. would not be able to provide a stable environment for the children. Based on the foregoing, we conclude that clear and convincing evidence established that termination of Father B.'s and Father D.'s parental rights was in the children's best interest.

CONCLUSION

We reverse the juvenile court's termination of Father D.'s parental rights on the ground of willingness and ability to assume custody of Whisper. We affirm the juvenile court's ruling in all other aspects. Costs of this appeal are assessed against the appellants, Justin B. and Charles D., for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE

- 15 -